# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
## WESTERN DIVISION

| | |
|---|---|
| SIOUX CITY FOUNDRY COMPANY, | |
| Plaintiff, | No. C20-4030-LTS |
| vs. | |
| AFFILIATED FM INSURANCE COMPANY, | **MEMORANDUM OPINION AND ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** |
| Defendant. | |

## I.    INTRODUCTION

This case is before me on a motion for summary judgment (Doc. 55) filed by defendant Affiliated FM Insurance Company (Affiliated). Plaintiff Sioux City Foundry Company (SCFC) filed a resistance (Doc. 56) and Affiliated filed a reply (Doc. 57). I find that oral argument is not necessary. *See* Local Rule 7(c).

## II.    BACKGROUND

SCFC commenced this action on April 29, 2020, by filing a petition at law and jury demand in the Iowa District Court for Woodbury County. Doc. 3. On May 29, 2020, Affiliated removed the case to this court based on diversity of citizenship jurisdiction pursuant to 28 U.S.C. § 1332. Doc. 1. SCFC and Affiliated are parties to an insurance policy (the Policy). Doc. 3 at 9. In its second amended complaint, SCFC alleges that Affiliated failed to pay amounts owed to SCFC for a covered loss and asserts claims for breach of contract (Count I) and first-party bad faith (Count II). Doc. 24 at 6–7, ¶¶ 25–35.

SCFC has stipulated to the dismissal of Count II with prejudice. Doc. 54. In Count I, SCFC alleges that Affiliated breached the Policy by denying that a single loss

event occurred on July 11, 2017, denying and not paying covered losses and property damage caused by the event and denying and not paying the full value of its business interruption coverage. Doc. 24 at 6-7, ¶¶ 30. SCFC contends that the sum Affiliated has paid to date reflects only a portion of the covered loss and that Affiliated has refused to pay the full amount of the loss. *Id*. at 5-6, ¶¶ 23–24, 29.

With regard to specific items of allegedly-covered loss, SCFC has withdrawn its claim for reimbursement due to alleged switchgear and transformer damage. Doc. 56-2 at 6. As will be discussed further below, this leaves the following items at issue: (1) replacement of the bus duct, (2) replacement of the ground field, (3) certain professional fee reimbursements and (4) reimbursement of a second deductible. *Id*.

## III. SUMMARY JUDGMENT STANDARDS

Any party may move for summary judgment regarding all or any part of the claims asserted in a case. Fed. R. Civ. P. 56(a). Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A material fact is one that "'might affect the outcome of the suit under the governing law.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Thus, "the substantive law will identify which facts are material." *Id.* Facts that are "critical" under the substantive law are material, while facts that are "irrelevant or unnecessary" are not. *Id.*

An issue of material fact is genuine if it has a real basis in the record, *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)), or when "'a reasonable jury could return a verdict for the nonmoving party' on the question." *Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) (quoting *Anderson*, 477 U.S. at 248). Evidence

2

that only provides "some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586, or evidence that is "merely colorable" or "not significantly probative," *Anderson*, 477 U.S. at 249–50, does not make an issue of material fact genuine.

As such, a genuine issue of material fact requires "sufficient evidence supporting the claimed factual dispute" so as to "require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson*, 477 U.S. at 248–49. The party moving for entry of summary judgment bears "the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel*, 953 F.2d at 395 (citing *Celotex*, 477 U.S. at 323). Once the moving party has met this burden, the nonmoving party must go beyond the pleadings and by depositions, affidavits, or otherwise, designate specific facts showing that there is a genuine issue for trial. *Mosley v. City of Northwoods*, 415 F.3d 908, 910 (8th Cir. 2005). The nonmovant must show an alleged issue of fact is genuine and material as it relates to the substantive law. If a party fails to make a sufficient showing of an essential element of a claim or defense with respect to which that party has the burden of proof, then the opposing party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 322.

In determining if a genuine issue of material fact is present, I must view the evidence in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587–88. Further, I must give the nonmoving party the benefit of all reasonable inferences that can be drawn from the facts. *Id.* However, "because we view the facts in the light most favorable to the nonmoving party, we do not weigh the evidence or attempt to determine the credibility of the witnesses." *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 784 (8th Cir. 2004). Instead, "the court's function is to determine whether a dispute about a material fact is genuine." *Quick v. Donaldson Co., Inc.*, 90 F.3d 1372, 1376–77 (8th Cir. 1996).

3

## IV.    RELEVANT FACTS

The following facts are undisputed for purposes of Affiliated's motion unless otherwise noted:

A damaging "bus duct arc event" (the Event) occurred at SCFC's foundry facility while SCFC was covered by the Policy issued by Affiliated.  Doc. 56-1 at 1, 3 ¶¶ 1, 4. Under the Policy, "payment for property not actually repaired or replaced within two years of the date of loss or damage is on an actual cash basis."  *Id.* at 18, ¶ 43.  The relevant reimbursement provisions of the Policy are:

1.     Adjustment of physical loss to property will be determined based on the lesser of the following unless stated otherwise below or elsewhere in this Policy:
   a)     The cost to repair.
   b)     The cost to rebuild or replace on the same site with new materials of like size, kind and quality.
   c)     The cost to rebuild, repair or replace on the same or another site, but not to exceed the size and operating capacity that existed on the date of loss.
   ***
9.     On unrepairable electrical or mechanical equipment, including computer equipment, the cost to replace such equipment with equipment that is the most functionally equivalent to that damaged or destroyed, even if such equipment has technological advantages and/or represents an improvement in function and/or forms of a program of system enhancement.
   ***
13.     On property if not repaired, replaced or rebuilt on the same or another site within two years from the date of loss, unless such time is extended by the Company, the **actual cash value**.
   ***
**[A]ctual cash value** means the cost to repair or replace the property, on the date of the loss or damage, with material of like kind and quality, less proper deduction for obsolescence and physical depreciation.

Doc. 55-3 at 207-08, 213 (emphasis in original).

Because SCFC's foundry requires a substantial load of electricity, it used metal bars known as bus bars, not wires, to carry electricity stepped down from the power

4

company through its electrical transformer into the facility. *Id.* at 9-12, ¶¶ 23, 27-29. These metal bars, which were the source of the Event, are encased in a metal box, and that system is referred to as a "bus duct." *Id.* at 12, ¶ 28. Each separate bus bar inducts electricity from one place to another, but "[p]ower is not supposed to jump between the bars within the bus duct, or jump between the bars and the ground." *Id.* at 12-13, ¶¶ 29-30. When electricity does jump between the bars, an event referred to as "arcing," the metal bars are destroyed, and the electricity returns to the transformers. *Id.* at 13-14, ¶ 30-31.

The arcing Event at issue took place on July 11, 2017, and caused property damage. *Id.* at 1, ¶ 1. Not only was the bus duct itself damaged, but the rogue electrical current flowed back through the transformer and to either the "arrestors,[1] which are above ground, or to the grounding system, which is beneath the ground." *Id.* at 30, ¶ 74 (footnote added). This is because "the arrestors are on a line that is actually bifurcated from one of the grounding system lines." *Id.* at 31, ¶ 74.

Of the three arrestors on the bifurcated line, "two arrestors received a sufficient amount of electrical power (current), such that they need[ed] to be replaced." *Id.* at 32, ¶ 76. The two damaged arrestors indicated "significant [electrical] flow activity came back upstream from the bus duct." *Id.* These two arrestors were replaced, but the grounding system, which was also connected to the transformer through the same Y-line as the arrestors, was not tested after the Event. *Id.* at 32, ¶¶ 76-77. The grounding system could have been tested "at the same time the arrestors were replaced and the transformer was tested" but was not. *Id.* at 32, ¶ 77. According to Affiliated:

> [SCFC's] allegation that the excess current from the bus duct arc flash event flowed to the grounding system and damaged the grounding system is accordingly not supported by the physical evidence, since the arrestors were damaged, and had additional capacity to take more damage, via the third arrestor, and the grounding system aboveground wire was not damaged.

---

[1] An "arrestor takes the excess current, and may be damaged in the process, to protect the other equipment – here, the transformer." *Id.* at 31, ¶ 75.

*Id.* at 33, ¶ 79. SCFC admitted that all of Affiliated's statements "occurred" but notes that one of its experts, Nathan Brandt, "states the ground field was in fact damaged by the [Event]." *Id.* at 34, ¶ 79.

Soon after the Event, SCFC's electrical contractor, Thompson Electric, removed the bus duct and installed a wireway ("cables that perform the same function as the bus bar"). *Id.* at 3, ¶ 5. The next day, July 12, this repair "blew up" after four minutes. *Id.* The parties agree that this second electrical event, the wireway arc event, is separate and distinct and was generally due to either defective materials or Thompson Electric's workmanship. *Id.* at 3, 16, ¶¶ 5, 35.

Thompson Electric replaced the blown wireway with a new wireway and those repairs have been powering the plant since July 13, 2017. Doc. 56-1 at 16, ¶ 35. From July 11, 2017, to April 2, 2018, SCFC paid a total of $205,973.06 for various repairs to its facilities, including repairs Affiliated does not believe were related to the Event and for which it did not reimburse SCFC under the Event claim. *Id.* at 40-42, ¶¶ 95-97. SCFC also paid $67,523.13 for professional fees that it claims Affiliated must reimburse under the Policy's Professional Fees provision. *Id.* at 42-43, ¶¶ 98-100. Thus, SCFC paid a total of $273,496.19 for repairs and services within the relevant time period. *Id.* at 44, ¶ 101.

The professional fees were incurred to investigate the cause of the Event and to estimate the resulting losses. *Id.* at 6-7, ¶¶ 14, 16. SCFC retained Todd Weidner, "an electrical engineer who typically focuses on risk assessment, in relation to arc flash events," two months after the Event. *Id.* at 6, 9, ¶¶ 14, 22. Thompson Electric later retained Nathan Brandt, another electrical engineer, who reviewed Weidner's work product and based his report on Weidner's work. *Id.* at 5-7, ¶¶ 12, 15. Brandt was unaware of the second wireway arc event "and his initial work product therefor did not mention it, and he was not asked to prepare revised/corrected reports." *Id.* at 7, ¶ 15.

6

SCFC also retained Michael Fazekas, an accountant with BDO USA, LLC (BDO), to make a claim under the Policy's Business Loss provision. *Id.* at 7, 34, ¶¶ 16, 81-83.

SCFC made a claim under the Policy for losses caused by the Event. *Id.* at 3, ¶ 4. However, SCFC "did not make a claim for the wireway arch [sic] flash event, and, in fact, did not disclose to Affiliated FM that a second event had occurred until after this lawsuit was filed." *Id.* at 4, ¶ 6. Affiliated reimbursed SCFC for repairs in the amount of $188,125.70. *Id.,* ¶ 7 (calculated by subtracting Affiliated's listed Business Interruption payment from the total amount paid). In addition, SCFC told Affiliated that it had "sufficient back-up support for a claim under the Business Interruption provisions of the Policy." *Id.* at 34, ¶ 84. Affiliated paid SCFC a total of $271,599.00 in business loss damages based on SCFC's representations. *Id.* at 35, ¶ 84. Affiliated's total payment to SCFC relating to the Event was $459,724.70. *Id.* at 42, ¶ 97.

Affiliated's forensic accountant, Steven Gregoire, has "evaluated several thousand pages of documentation in connection with the claim that [SCFC] incurred a Business Interruption loss, as that term is used in the Policy." *Id.* at 35, ¶ 85. Gregoire opined that, while SCFC could have *possibly* produced proof of an actual business income loss, "the BDO Report and submissions of [SCFC] have not established that an actual sales loss occurred due to the production prevented." *Id.* at 35, ¶ 86.

Following Affiliated's investigation, SCFC admitted that it "couldn't find a reasonable justification for the business income claim" BDO calculated and withdrew BDO and its accountant as witnesses. *Id.* at 7, 36-37, ¶¶ 16, 87. However, SCFC now claims "an additional business loss," beyond its admittedly unjustifiable first claim of business loss. *Id.* at 38, ¶ 89. This claim is for the deductible applied to SCFC's second business loss claim "because [SCFC] believes only one business interruption deductible should be taken on this claim." *Id.* at 37, ¶ 88 (quoting SCFC Corporate Representative Tr. 41:8-12).

# V.    DISCUSSION

As noted above, SCFC contends that Affiliated breached the Policy by denying that a single loss event occurred on July 11, 2017, denying and not paying covered losses for property damage caused by the event and denying and not paying the full value of its business interruption coverage.  Doc. 24 at 6-7, ¶¶ 30.  Affiliated raises three arguments in support of its motion for summary judgment: (1) SCFC cannot recover reimbursement for equipment SCFC says needs replacement because it has not actually replaced any such equipment, "the insurance policy precludes [SCFC] from seeking payment for more than the 'actual cash value' of the property" and SCFC "has absolutely no proof of the actual cash value of any property, and it has no witnesses that can present such opinions;" (2) SCFC "lacks evidence that the bus duct arc flash event damaged any property other than the bus duct itself;" and (3) "the $459,697.70 paid by Affiliated FM fully compensated [SCFC] for the bus duct arc flash event damage."  Doc. 55-1 at 5-7.

SCFC's resistance is confusing and unhelpful at best and internally contradictory at worst.  *Compare* Doc. 56-2 at 13 ("this bus duct was repaired and or rebuilt or replaced so the requirements of paragraph 1 are met and the amount to be paid is either, cost to repair, rebuild or replace on the same site with new material of like size, kind and quality or the cost to rebuild repair or replace") *with* Doc. 56-2 at 15 ("[p]laintiff only claims actual cash value for the bus duct and the ground field").  Cutting through the fog, it appears that SCFC asserts four claims for additional payments under the Policy but addresses only three of them in its argument:[2]

1.    Replacement of the bus duct in the claimed amount of $38,500.00.
2.    Replacement of the ground field in the claimed amount of $6,206.18.

---

[2] SCFC includes professional fees reimbursement in its list of pending claims but cites no evidence of the alleged fees and, indeed, never mentions them again.  *See* Doc. 56-2 at 13.  Since the nonmoving party must go beyond the pleadings and by depositions, affidavits, or otherwise, and designate specific facts showing that there is a genuine issue for trial once the moving party has met its burden, *Mosley v. City of Northwoods*, 415 F.3d 908, 910 (8th Cir. 2005), I find that SCFC has waived its claim for reimbursement of professional fees.  *See Stults v. Bush Boake Allen, Inc.*, No. C11–4077–MWB, 2014 WL 775525, at *2-4 (N.D. Iowa Feb. 25, 2014).

8

3.      Professional reimbursements in the claimed amount of $8,350.00.

4.      Reimbursement of a second deductible in the amount of $102,739.00.

Doc. 56-2 at 6.

## 1.    *Applicable Legal Standards*

"State law governs the interpretation of insurance policies when federal jurisdiction is based on diversity of citizenship." *Secura Ins. v. Horizon Plumbing, Inc.*, 670 F.3d 857, 861 (8th Cir. 2012). I previously found that Iowa law applies in this case. Doc. 21 at 7. Under Iowa law, a party claiming a breach of contract must prove the existence, terms, and conditions of the contract, that the claimant has performed all of the terms and conditions required under the contract, and that the defendant breached the contract and caused damages. *Molo Oil Co. v. River City Ford Truck Sales, Inc.*, 578 N.W.2d 222, 224 (Iowa 1998). A breach occurs when a party fails to perform part of the contract without legal excuse. *Id.* Questions of performance or breach are generally for the jury. *See, e.g.*, *Iowa–Illinois Gas & Elec. Co. v. Black & Veatch*, 497 N.W.2d 821, 825 (Iowa 1993); *Taylor Enter., Inc. v. Clarinda Prod. Credit Ass'n*, 447 N.W.2d 113, 115 (Iowa 1989). However, contract construction and the interpretation of contractual terms, unless dependent on extrinsic evidence, are issues for the court. *Iowa–Illinois Gas & Elec. Co.*, 497 N.W.2d at 825.

Because "insurance policies are contracts between the insurer and insured, [they] must be interpreted like other contracts, the objects being to ascertain the intent of the parties." *Talen v. Employers Mut. Cas. Co.*, 703 N.W.2d 395, 407 (Iowa 2005). "If the language of the policy is unambiguous, . . . that intent is determined by what the policy itself says." *Monroe County v. International Ins. Co.*, 609 N.W.2d 522, 525 (Iowa 2000). "An ambiguity exists when, after application of our relevant rules of interpretation, a genuine uncertainty results as to which of two or more meanings is proper." *Am. Fam. Mut. Ins. Co. v. Petersen*, 679 N.W.2d 571, 576 (Iowa 2004), *amended on denial of reh'g* (May 6, 2004). "When two reasonable interpretations exist,

9

the policy is construed most favorably to the insured." *Id.* However, courts "will not give a strained or unnatural reading to the words of the policy to create ambiguity where there is none." *Morgan v. Am. Family Mut. Ins. Co.*, 534 N.W.2d 92, 99 (Iowa 1995), *overruled on other grounds by Hamm v. Allied Mut. Ins. Co.*, 612 N.W.2d 775, 784 (Iowa 2000).

With regard to the amount of damages, "when a contract has been breached the nonbreaching party is generally entitled to be placed in as good a position as [that party] would have occupied had the contract been performed." *Midland Mut. Life Ins. Co. v. Mercy Clinics, Inc.*, 579 N.W.2d 823, 831 (Iowa 1998). Damages for breach of contract are limited to "those injuries which may reasonably be considered as arising naturally from the breach of contract itself, or such as may reasonably be supposed to have been in the contemplation of the parties, at the time of contracting, as a probable result of the breach." *R.E.T. Corp. v. Frank Paxton Co., Inc.*, 329 N.W.2d 416, 420 (Iowa 1983) (citing *Meyer v. Nottger*, 241 N.W.2d 911, 920 (Iowa 1976)). The plaintiff "must prove that the damages resulted from [the defendant's] breach and were in the contemplation of the parties. *Royal Indem. Co. v. Factor Mut. Ins. Co.*, 786 N.W.2d 839, 846 (Iowa 2010). Damages "must be ascertainable with reasonable certainty without resort to speculation and conjecture." *Palmer v. Albert*, 310 N.W.2d 169, 174 (Iowa 1981).

Under Iowa law, the party claiming entitlement to coverage under an insurance policy must prove compliance with its terms. *Am. Guar. & Liab. Ins. Co. v. Chandler Mfg. Co.*, 467 N.W.2d 226, 228 (Iowa 1991); *Bruns v. Hartford Accident & Indem. Co.*, 407 N.W.2d 576, 579 (Iowa 1987); *Henschel v. Hawkeye–Security Ins. Co.*, 178 N.W.2d 409, 415 (Iowa 1970); *Henderson v. Hawkeye–Security Co.*, 252 Iowa 97, 106 N.W.2d 86, 91 (Iowa 1960). The party claiming coverage may meet this burden of proof by showing: (1) substantial compliance with the condition precedent; (2) the failure to comply was excused or waived; or (3) the failure to comply was not prejudicial to the insurer. *Am. Guar.*, 467 N.W.2d at 228; *Henderson*, 106 N.W.2d at 92. Under Iowa law, waiver is "the intentional relinquishment of a known right." *Huisman v. Miedema*,

644 N.W.2d 321, 324 (Iowa 2002) (quoting *State v. Hallum*, 606 N.W.2d 351, 354 (Iowa 2000)). Further, an insured's violation of a condition precedent is presumed to be prejudicial to the insurer. *Met–Coil Sys. Corp. v. Columbia Cas. Co.*, 524 N.W.2d 650, 658 (Iowa 1994); *Am. Guar.*, 467 N.W.2d at 228. However, the insured may rebut the presumption if it shows the lack of prejudice by satisfactory evidence. *Met–Coil*, 524 N.W.2d at 658; *Western Mut. Ins. Co. v. Baldwin*, 258 Iowa 460, 137 N.W.2d 918, 925 (Iowa 1965).

**2.      *Discussion***

   **A.      *Physical Damage (Bus Duct and Ground Field)***

      **i.      *Affiliated's Argument***

Affiliated notes that under the Policy, SCFC can claim only the actual cash value with regard to property that has not been repaired, replaced or rebuilt after two years. Doc. 55-1 at 7, 11. Affiliated claims it is SCFC's burden "to provide proof of all the conditions of the insurance policy, including its damages." *Id.* at 11. Thus, SCFC must provide evidence of the actual cash value of a future possible bus duct replacement and the allegedly-damaged ground field. *Id.*

The Policy defines actual cash value as "the cost to repair or replace the property, on the date of the loss or damage, with material of like kind and quality, less proper deduction for obsolescence and physical depreciation." *Id.* Affiliated explains that none of SCFC's "five disclosed non-retained experts ha[ve] provided an opinion—or were disclosed to have an opinion—on actual cash value of its component parts." *Id.* at 12. Further, SCFC's experts cannot "present new opinions in service of [SCFC]'s interests in the litigation" because SCFC "made disclosures solely under Rule 26(a)(2)(C), which relates to non-retained expert witnesses." *Id.* at 11-12. Therefore, since SCFC's disclosed experts "have provided no opinions about actual cash value" and "it is indisputable that pre-suit they never gave such an opinion," Affiliated asserts that "[s]ummary judgment is . . . warranted on all claims that additional payments are owed

11

by Affiliated FM with regard to any alleged physical damage to [SCFC]'s property." *Id.* at 12, 14.

Affiliated also argues that apart from SCFC's failure to prove the actual cash value of the bus bar, SCFC has not shown it is entitled to any payment for the physical equipment damages it claims. This is because Affiliated has already paid to replace the damaged bus duct following the July 11, 2017, Event. Doc. 55-1 at 14. SCFC had Thompson Electric install a wireway, the second of which has been in continuous operation as of July 13, 2017, after the first wireway installation failed for an unknown reason. *Id.* SCFC has not replaced the wireway with a new bus duct but asserts it intends to replace it at some time in the future. *Id.* SCFC claims the replacement cost would be $38,500. *Id.* Affiliated asserts that: (1) it has already paid for the wireway installation as a replacement for the damaged bus duct; (2) SCFC has not provided evidence of the actual cash value of a bus duct, and; (3) in the alternative, the total amount Affiliated has paid "exceeds the damages [SCFC] can actually prove were caused by the bus duct arc flash event." *Id.* at 14-15. This includes SCFC's electrical grounding system, which Affiliated asserts was not damaged by the electrical event because the arrestors on a connected line instead took the excess voltage, as evidenced by their damage and replacement following the Event. *Id.* at 18-19. Affiliated also argues that if the grounding system had been damaged by the Event, the arrestors would not have shown physical damage and instead the wire to the grounding system would have had visible damage. *Id.* at 19. Thus, Affiliated asserts that SCFC "presented no more than a theory that the grounding system was damaged by the bus duct arc flash event, and that theory is not supported by the actual evidence." *Id.*

### ii. *SCFC's Resistance*

As noted above, SCFC's resistance is a mess as to the issue of whether it seeks replacement cost or actual cash value for the bus bar. *See* Doc. 56-2 at 13, 15 (making statements that are directly in conflict). Further, in response to Affiliated's argument

that SCFC's experts have not opined on the actual cash value of either the bus bar or the ground field, SCFC cites *In re Bair Hugger Forced Air Warming Devices Prods. Liab. Litig.*, 9 F.4th 768 (8th Cir. 2021), but does not explain how that case applies. *Id*. at 14-15. SCFC simply asserts that "the Court should allow the testimony of [SCFC experts] Weidner and Brandt to be tested by the means cited." *Id*. at 15. SCFC later mentions that three of its expert witnesses were deposed and, "[a]t least on the issue of the cost of replacement of the bus bar, none of the [factors from *Anderson v. Bristol*, 936 F. Supp. 2d 1039 (S.D. Iowa 2013)] disqualify because Defendants [sic] expert, Scott Cramer agreed." *Id*. at 15-16. Regarding the grounding system, SCFC states that Affiliated "has ample opportunity to challenge any such testimony which it did by means of its own expert so Plaintiff's experts should not be barred. In addition Defendant secured its own expert opinions. Consequently, there is not prejudice to be shown." *Id*. at 16.

While making these assertions, SCFC did not respond to Affiliated's arguments (1) that SCFC provided no evidence of the actual cash value of the bus bar sufficient to survive a motion for summary judgment, or (2) that Brandt's testimony regarding the grounding system is nothing more than an unproven, speculative theory. SCFC even admits that "there is no genuine issue of material fact as to what documented opinions the non-retained experts gave and did not give" and that Weidner "expressed no opinions about valuation of any item of property at SCF's plant." Doc. 56-1 at 8, 25, ¶¶ 18, 60. SCFC also admits that its "claims of replacement cost damages are not reflective of the repair cost on the date of loss, which was July 11, 2017," as required by the actual cash value provision of the Policy. *Id*. at 40, ¶ 93.

Instead, SCFC claims a total owed of $68,099.17, including $38,500.00 for a future bus bar replacement. Doc. 56-2 at 11. The remainder seems to include $6,206.18 for the grounding field and a leftover amount of physical damage payments that SCFC employee Sheracy Bennett believes Affiliated has not reimbursed. *Id*. at 10-11. The basis of the remaining amount of the claim, $23,392.99, remains a mystery, as SCFC provided no support other than Bennett's internal SCFC documentation of the physical

damage payments SCFC made and Affiliated already reimbursed.  *Id.* at 11; *see* Doc. 55-3 at 388-89 (Depo. Ex. 21).

With regard to the bus bar replacement, SCFC's position is that because of "the need to get its operation back up immediately, wiring from the transformer to the switch gear was installed rather than a bus duct replacement."  Doc. 56-2 at 5.  While Affiliated's expert generally agreed that $38,500.00 for a bus bar replacement would be "within reason;" SCFC has not actually installed a new bus bar and has been operating with the "temporary" wireway since July 2017.  *Id.* at 8, 12-13.

As for the grounding system, SCFC relies on deposition testimony from Nathan Brandt to claim that the Event "caused damage to the ground field."  *Id.* at 17.  SCFC admits that the scope of Brandt's work was to review Weidner's work and that he was not told about the wireway arc flash and his work product did not mention it.  Doc. 56-1 at 7, ¶ 15.  SCFC does not address Weidner's testimony that "there is not sufficient engineering evidence or a scientific basis to tie any defect in the grounding system to the bus duct arcing event."  *Id.* at 34, ¶ 80.  Instead, SCFC relies solely on Brandt, stating:

> Brandt viewed that electric current ran from the bus bar to a wire in the transformer, to the underground field.  He testified the current transmitted through a four aught wire which is a certain thickness or capacity.  He opined the wire transferred fault current to two aught wires in the underground system and that they would not hold the amount of current that a four aught wire would hold.  Therefore, the four aught wire "overloaded" the two aught underground wire.  The only issue is he did not actually see the two aught wire but relied on experience in other states that such a means of wiring was the practice.

Doc. 56-2 at 17-18.

SCFC acknowledges that the grounding system was not actually tested after the Event, or at any other time during 2017.  Doc. 56-1 at 32, ¶¶ 77-78.  Brandt testified that the basis for his conclusion that there was damage to the electrical grounding system was that "[t]he system bonding jumper had fused, meaning that it was opened, and the [visible, above-ground] wire [to the grounding system and the arrestors] had been

14

destroyed." Doc. 56-3 at 46, ¶¶ 17-23. SCFC admits that "[t]he allegation that the excess current from the bus duct arc flash event flowed to the grounding system is accordingly not supported by the physical evidence, since the arrestors were damaged, and had additional capacity to take more damage, via the third arrestor, and the grounding system aboveground wire was not damaged." Doc. 56-1 at 33-34, ¶ 79. SCFC attempts to qualify this admission by stating that "Nathan Brandt, P.E. states the ground field was in fact damaged by the [Event]" without citing to evidence to support Brandt's statement. *Id.* at 34, ¶ 79.

### iii.    *Affiliated's Response*

Affiliated notes that SCFC "admitted nearly every fact in Affiliated FM's Statement of Material Facts, and it submitted zero additional facts." Doc. 57 at 4. Affiliated also points out, with a dose of understatement, that SCFC's position regarding the proper damages calculation for a possible bus duct replacement "is somewhat confusing." *Id.* at 13. Affiliated argues: "If the wireway was the replacement, then Affiliated FM owes nothing since it paid for that." *Id.* In the alternative: "If [SCFC] wanted to remove the wireway and have a new bus duct installed and paid for on a replacement cost basis, it needed to do that within two years, meaning by July 11, 2019." *Id.* Affiliated also notes that SCFC's damages amount for the future bus bar replacement is based on a 2019 proposal from Thompson Electric, not a firm bid, and the proposal included two tasks that had already been completed.[3] *Id.* at 12.

As for the grounding system, Affiliated states that SCFC retained Weidner to do the investigation and Brandt "just looked at that work and did a report based on Mr. Weidner's work." Doc. 57 at 14. Further, Affiliated explains that SCFC has to tie any grounding system work that it did to the Event because the $6,206.18 expense otherwise

---

[3] In fact, Affiliated "already paid $33,982.15 to [SCFC] for the first two tasks shown on the October 22, 2019 proposal." *Id.* at 12; *see id.* at 13-14 for items and prices.

"would be within the $25,000 policy deductible." *Id.* at 15. Affiliated also cites to Brandt's testimony that he observed the above-ground part of the grounding system and observed that "the electrode conductor that came out of the ground and bonded to the base of the transformer" did not appear to be damaged. *Id.* Instead, Brandt "made the assumption, knowing that utilities typically undersize things . . . . that there was a number two wire in the grounding system." *Id.* at 15-16. Affiliated argues that Brandt's guess about the grounding system wire does not suffice to survive a motion for summary judgment because it is not evidence that the Event caused damage to the grounding system or, for that matter, that the system was actually damaged at all. *Id.* at 16.

## iv. *Analysis*

Affiliated has met its initial burden regarding SCFC's physical damages claims by "identifying those portions of the record which show a lack of a genuine issue." *Hartnagel*, 953 F.2d at 395 (citing *Celotex*, 477 U.S. at 323). Affiliated relies on the Policy language for its actual cash value argument and has pointed to specific evidence in the record supporting its argument that the grounding system was not damaged by the Event. SCFC's own investigating expert stated that there was no physical process by which the grounding system could have been damaged by the Event. This statement is supported by the uncontroverted fact that the arrestors could have taken more damage from the Event but did not. SCFC has provided no evidence of the actual cash value of the bus bar, has not explained why the wireway is not a comparable replacement if the actual cash value provision does not apply, and merely relies on a conclusory statement from one of its experts that the Event caused the damage he speculated had occurred to the underground system.

SCFC has not made any argument regarding the actual cash value provision of the Policy under Iowa contract law. The Policy requires a specific calculation of an equipment's actual cash value "if not repaired, replaced or rebuilt on the same or another site within two years from the date of loss, unless such time is extended by the Company."

Doc. 55-3 at 208. This calculation is "the cost to repair or replace the property, on the date of the loss or damage, with material of like kind and quality, less proper deduction for obsolescence and physical depreciation." *Id.* at 213. Because this language is not ambiguous, the parties' intent "is determined by what the policy itself says." *Monroe County v. International Ins. Co.*, 609 N.W.2d 522, 525 (Iowa 2000).

Based on the undisputed facts of record, SCFC's claim for additional reimbursement based on physical damage fails for two reasons. First, Affiliated has already paid to replace the damaged bus bar with a wireway. SCFC has produced no evidence supporting its conclusory argument that the wireway was not a proper comparable replacement (in fact, it is not even clear from SCFC's resistance that it is making such an argument). The record demonstrates that SCFC has used the wireway, instead of a bus bar, to supply electricity to its facility since 2017.

Second, to the extent SCFC relies on the 2019 bid from Thompson Electric for installing a new bus bar, this proposed installation has not happened. Moreover, a replacement cost bid issued in 2019 does not address the Policy's requirement of establishing "the cost to repair or replace the property, on the date of the loss or damage . . . less proper deduction for obsolescence and physical depreciation." Doc. 55-3 at 208. Indeed, SCFC has admitted that "there is no genuine issue of material fact as to what documented opinions the non-retained experts gave and did not give" and that Weidner, an expert SCFC retained to investigate the bus bar arc flash event, "expressed no opinions about valuation of any item of property at SCF's plant." Doc. 56-1 at 8, 25, ¶¶ 18, 60. Based on this record, no reasonable jury could award damages for a future bus bar replacement on an actual cash value basis pursuant to the Policy.

As for the grounding system, SCFC contends Affiliated breached the Policy by not reimbursing the $6,206.18 cost of grounding system work performed on April 2, 2018. Doc. 56-2 at 6; Doc. 55-3 at 389. As Affiliated notes, this expense item falls within the $25,000 deductible that applies to separate claims under the Policy. Thus,

SCFC cannot recover it absent evidence that would allow a reasonable jury to find that the July 11, 2017, Event caused this damage.

Weidner agrees that "there is not sufficient engineering evidence or a scientific basis to tie any defect in the grounding system to the bus duct arcing event." Doc. 56-1 at 34, ¶ 80. Brandt, an expert SCFC retained to review Weidner's findings, came to an opposite conclusion based on his experience and his best guess based on general wiring practices. While he viewed the above-ground portion of the grounding system, he did not inspect the allegedly undersized wire that SCFC claims was damaged due to the Event. Doc. 56-2 at 17-18. The grounding system was not tested immediately after the event or, for that matter, at any time during 2017. Doc. 56-1 at 32, ¶¶ 77-78.

SCFC contends Brandt's deposition testimony shows that the grounding system was damaged by the Event. Doc. 56-1 at 34, ¶ 79. However, neither Brandt nor SCFC have identified any evidence suggesting a causal connection between the Event and the need for the work performed on the grounding system nearly nine months after the Event. Indeed, SCFC has admitted that "[t]he allegation that the excess current from the bus duct arc flash event flowed to the grounding system is accordingly not supported by the physical evidence, since the arrestors were damaged, and had additional capacity to take more damage, via the third arrestor, and the grounding system aboveground wire was not damaged." Doc. 56-1 at 33-34, ¶ 79. Thus, Brandt's testimony is nothing but sheer speculation that the grounding system was damaged and that the Event caused the damage. This is not sufficient to generate a genuine issue of material fact. *See Matsushita*, 475 U.S. at 586.

SCFC has failed to produce evidence supporting its contention that Affiliated breached the Policy with regard to either the bus bar or the grounding system. As such, Affiliated is entitled to summary judgment on SCFC's physical equipment reimbursement claims.

### B.    Business Interruption Deductible

#### i.    Affiliated's Argument

Affiliated argues that by paying $459,697.70, it "has paid more on the [Event] claim than [SCFC] has actual evidence to support." Doc. 55-1 at 23. Affiliated states that it paid $271,599.00 on a Business Interruption claim in reliance on SCFC's representations about that claim. *Id.* at 20. However, SCFC later determined that it could not support a business loss of $271,599.00. Thus, Affiliated asserts that SCFC has no basis to argue that Affiliated wrongly applied a deductible to a second, separate business loss claim because it "has no evidence to support *any* Business Interruption loss." *Id.* at 20-21.

According to Affiliated, then, its total payment of $459,697.70 is greater than SCFC's supportable losses of $205,973.06 for physical damage and $67,523.13 for professional fees, meaning SCFC "has no recoverable damages under the Policy." *Id.* at 22. In fact, along with the $271,599.00 Affiliated paid SCFC for an alleged business loss, Affiliated notes that it has also already paid for "nearly all of . . . the $205,973.06 in property damage invoices . . . excluding the grounding system work" plus $32,476.87 towards professional fees. *Id.* Affiliated argues that there was no breach of contract, as a matter of law, because SCFC cannot establish that it is entitled to any recovery beyond what Affiliated has already paid. *Id.* at 23.

#### ii.    SCFC's Resistance

SCFC notes that one of its employees, Bennett, believes Affiliated "paid $18,886.00 in [Business Interruption Loss] on a second claim apparently due to a separate event," though SCFC claims that Affiliated "never articulated its basis for a second event or identified what that is." Doc. 56-2 at 7. Based solely on this allegation, SCFC argues

that the deductible for this second payment was "either $94,600.00 ([Affiliated] calculation) or $102,730.00 ([SCFC] calculation)."[4]  *Id.*

Bennett testified that Affiliated "made a second [Business Interruption Loss] payment of $18,886.00 due to ongoing arc flash issues but had opened a separate claim resulting in the imposition of a new deductible."  Doc. 56-3 at 60; Doc. 56-2 at 11. SCFC states that "[t]his payment was based on ongoing noise issues of the grounding system in February 2018."[5]  Doc. 56-2 at 11.  SCFC suggests that Affiliated has not overpaid SCFC's claim because Bennett's deposition testimony was "interpreted differently by [Affiliated] counsel."  *Id.* at 16.  However, SCFC cites to a part of the transcript in which Bennett stated that she does not dispute Affiliated's business interruption loss calculation.  Doc. 56-3 at 94, ¶¶ 6-16.  Later, in response to an inquiry as to whether it would have been unreasonable for Affiliated to refuse to pay SCFC's claim of business loss between $1.8 and $2.4 million, Bennett testified that she had "no idea how they justified building the [Business Interruption Losses], so I can't answer to that. I -- I really don't know.  I just know that I can't reproduce it and stand behind it." *Id.* at 141, ¶¶ 17-24.  She further explained that "I'm data-driven, and I need to see data specifics from point A to point Z, and I couldn't justify what I saw [from BDO]."  *Id.* at 142, ¶¶ 9-12.

According to SCFC, Affiliated "has unnecessarily interpreted this as abandonment of all interruption claims."  Doc. 56-2 at 17.  What ostensibly remains of SCFC's Business Interruption Loss claim is the deductible amount Affiliated applied to a second Business Interruption Loss payment (allegedly $102,379.00) that SCFC believes should have been billed as part of the admittedly unjustifiable first Business Interruption Loss

---

[4] It is unclear why SCFC believes it is entitled to reimbursement of an ambiguous deductible amount applied to a payment that SCFC does not know why it received in the first place.

[5] Bennett testified that "[f]ollowing the arc flash event, [SCFC] continued to have electrical issues that affected the furnace output.  They tracked down to finding noise in the line and figured out how to fix that and fix the ground."  Doc. 56-3 at 95, ¶¶ 10-17.

claim, thus avoiding the second deductible. *Id.* at 11-12. SCFC "claims that the original [Event] repair was only temporary and since the wireway blew, it is one insurable event with only one deductible" in an attempt to bundle both unsupported business loss claims into one insurable event. *Id.* at 19. However, SCFC does not explain why it is entitled to either of the business loss reimbursements in the first place, regardless of a second deductible. It instead admits that "it cannot justify a claim of business interruption loss, particularly in light of the withdrawal of BDO as a witness," while also bewilderingly pointing to Bennett's deposition as evidence that there was "an additional business interruption loss." Doc. 56-1 at 38, ¶ 89. Further, SCFC denied Affiliated's statement of material fact that SCFC has no evidence to contradict Affiliated's expert's opinion "that the evidence does not support a finding that [SCFC] incurred any loss that would be compensable under the Business Interruption coverage." *Id.* at ¶ 90. However, SCFC did not support its denial with any citation to the record. *Id.*

### iii. *Affiliated's Response*

Affiliated reiterates that SCFC has not shown that it is entitled to any additional recovery under the Policy beyond the $459,724.70 Affiliated has already paid. Doc. 57 at 4-5. Indeed, Affiliated contends that SCFC has failed to produce evidence that it was entitled to either the first or second of the business interruption loss payments.[6] Thus, Affiliated argues that it is entitled to summary judgment on SCFC's claim that Affiliated wrongly applied a deductible to the second business interruption loss payment, regardless of whether there was one business interruption event or two. *Id.* at 7.

_____

[6] Affiliated addresses the second payment by explaining that it told SCFC "that it did not agree there was an actual loss sustained by [SCFC], but would nonetheless make certain payments for settlement purposes to try to resolve claims." *Id.* at 8. In an email to SCFC, Affiliated stated, "we have not been provided with support that confirms the damage to the air switches was related to the July 11, 2017 arcing event or any other events." *Id.* Thus, Affiliated paid out the second business interruption loss for "February 2018 air switch issues." *Id.*

#### iv. Analysis

Based on the record before me, little analysis of this claim is necessary. Under Iowa law, the party seeking to recover under an insurance policy bears the initial burden of demonstrating that the claim complies with the policy's terms. *See, e.g., Am. Guar. & Liab. Ins. Co. v. Chandler Mfg. Co.*, 467 N.W.2d 226, 228 (Iowa 1991). SCFC has failed to come forward with evidence that would allow a reasonable jury to find that it is entitled to any additional payments under the Policy, either for business interruption loss or otherwise, beyond what Affiliated has already paid. Regardless of whether SCFC was entitled to the first business interruption loss payment, it has not provided any evidence that the second payment should have been included in that original payment, thereby circumventing the second business interruption loss deductible. As a matter of law, SCFC has been paid at least as much, if not more, than what it is entitled to recover under the Policy. Affiliated is entitled to summary judgment on this claim.

## VI. CONCLUSION

For the reasons set forth herein:

1.     Affiliated's motion for summary judgment (Doc. 55) is **granted** as to all claims.

2.     Because this order disposes of all remaining claims, this action is hereby **dismissed** and judgment **shall enter** in favor of Affiliated and against plaintiffs.

3.     The trial of this case, currently scheduled to begin March 28, 2022, is hereby **cancelled**.

4.     The Clerk of Court shall **close this case**.

22

**IT IS SO ORDERED.**

**DATED** this 4th day of January, 2022.

_____
Leonard T. Strand, Chief Judge